### NATIONAL SURETY CO. v. BLUMAUER et al.

(Circuit Court of Appeals, Ninth Circuit. January 7, 1918.)

#### No. 2967.

1. INDEMNITY ⬅12—CONTRACTS—CONTINUANCE.

Defendants, to enable a state bank to obtain a bond for county deposits, signed an agreement of indemnity. The original bond, running to the treasurer, which ran for one year, was conditioned to secure deposits of county moneys. Thereafter one of the defendants, who signed the indemnity agreement and was an officer of the bank, paid a renewal premium, and the bond was renewed for another period of one year. The indemnity agreement declared that no act or omission of the surety in modifying, amending, limiting, or extending the bond should affect the indemnitors' liability. A new treasurer having been elected, the surety, at the request of the same officer of the bank who paid the first renewal premium, issued a new bond, naming the new incumbent as treasurer, and such treasurer executed a release of liability up to the date of the issuance of such bond. Thereafter, while the second bond was in force, the bank failed, and the surety was compelled to pay a loss suffered by such treasurer on account of the deposit of county funds. *Held* that, as the purpose of the bond was to enable the bank to secure the deposit of county funds, and as the indemnitors knew that fact, their agreement of indemnity must be deemed in force at the time the loss was incurred; the change in treasurers not affecting their liability. as they in no way guaranteed the fidelity of the treasurer, and it being obvious that the parties treated the new bond as a continuation of the original.

2. INDEMNITY ⬅3—CONTRACTS—PUBLIC POLICY.

An agreement by indemnitors, who to hold a surety harmless on account of a bond conditioned upon repayment of county funds deposited with a bank, which agreement bound themselves, their heirs and assigns, until the surety should have executed a release under seal, is not contrary to public policy.

3. HUSBAND AND WIFE ⬅268(6), 270(5)—COMMUNITY ESTATE—LIABILITY.

Where officers and stockholders of a bank entered into an agreement of indemnity to save a surety harmless on account of a bond given to secure a deposit of county funds, such agreement is one of the community under the laws of Washington, and therefore the wives of the indemnitors were proper parties in an action thereon.

In Error to the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by the National Surety Company, a corporation, against Isaac Blumauer and others. There was a judgment for defendants, and plaintiff brings error. Reversed and remanded, with directions to grant new trial.

Action for judgment upon an indemnity bond. At the conclusion of plaintiff's evidence the court dismissed the plaintiff's action and entered judgment against the National Surety Company, plaintiff in error here. By writ of error the surety company brings the case for review. The facts are as follows:

The defendants in error, to be called: defendants, owned all except 12 shares of the capital stock of the State Bank of Tenino, which failed on September 17, 1914. Blumauer was president, Hays cashier, Mentzer vice president and director, and Campbell assistant cashier and director. Defendant Elizabeth E. Mentzer is the wife of T. F. Mentzer, Jessie E. Campbell is the wife of A. D. Campbell, and Eva Copping was the wife of David Copping, who died, but who, before death, conveyed his property to his wife. Defendants Blumauer, Hays, and Ora J. Hays, his wife, defaulted in the action. Thus the defendants proper herein are Mentzer and wife, Campbell and wife, and Mrs. Copping.

Prior to June 22, 1911, the bank applied to the surety company to become surety for the bank on a bond required by the laws of Washington to be taken by the county treasurer to secure the bank deposits of county funds. The application named the obligee to whom the bond was to run as "Treasurer, Thurston County, Washington." The bond was requested as of June 22, 1911, to terminate June 22, 1912. Applicants agreed to pay $25 premium annually, and stated that the officers who were to give continuous personal attention to the affairs of the bank were Blumauer, president, Mentzer, vice president, and Hays, cashier. With this application was an agreement between the bank, through its president and cashier, and the surety company, wherein it is recited that the company is about to execute for the depository the bond described in the application, which is made part of the agreement, and, in consideration of $1, the depository agrees with the company that the answers made in the application are true, and for the purpose of inducing the company to execute the bond without demanding collateral security from the depository, that the depository will pay to the company the premiums agreed in the application, and will at all times "indemnify and keep indemnified the company," and save it harmless against all demands and liabilities which it should sustain in consequence of having executed the bond. The depository bond was dated June 22, 1911, and was signed by the bank by its president and cashier, and by the surety company. It binds the bank as principal and the surety company as surety unto "Robert Marr, individually and as county treasurer of the county of Thurston, state of Washington," in the sum of $5,000. The condition is that whereas, Marr, as treasurer, "at the special' instance and request" of the bank, has deposited or may hereafter deposit' with the bank certain moneys, etc., for which "the said treasurer as such may be responsible," if the bank shall pay all the checks of the treasurer and hold harmless the above-named Robert Marr, individually and as such treasurer, from loss by reason of the deposit of funds, then the obligation is to be void; provided, however, that the surety company shall not be liable, except for loss of moneys belonging "to the said Robert Marr, treasurer, and which shall have been deposited with the aforesaid principal by the said Robert Marr, as treasurer aforesaid, or to his credit as such treasurer." It is further provided that the surety company shall have the right to end its suretyship under the bond by giving notice to the obligee, etc. The indemnity agreement, dated June 22, 1911, recites that whereas, "the undersigned" had requested the surety company to sign and execute a bond for $5,000 in behalf of the bank "in favor of the treasurer of Thurston county, Washington, effective June 22, 1911, covering deposits of the said treasurer in said bank, reference to which bond or undertaking is hereby made for the purpose of certainty, and a copy of which instrument is or may be hereto attached." It is agreed that, in consideration of the premises and of $1, the indemnitors will pay an

annual premium of $25, as the compensation to the surety company "for the accommodation afforded the undersigned by the execution of said instrument by the company"; that they will keep harmless the surety company against loss which may occur by reason of having executed the bond; that the surety company may take such steps as it may deem necessary to obtain its release under the bond or under any other instrument within the meaning of "section fifth" hereof. Section fifth is as follows: "That no act or omission of the company in notifying, amending, limiting, or extending the instrument so executed by the company shall in any wise affect our liability hereunder, nor shall we or any of us be released from this obligation by reason thereof; and we agree that the company may alter, change, or modify, amend, limit, or extend said instrument, and may execute renewal thereof, or other and new obligations in its place or in lieu thereof and without notice to us being expressly waived, and in any such case, we and each of us shall be liable to the company as fully and to the same extent on account of any such altered, changed, modified, limited, or extended instrument or such renewals thereof, or other or new obligations in its place or in lieu thereof, whenever and as often as made, as fully as if such instrument were described at length herein." The seventh clause of the agreement binds not only the signers jointly and severally, but their respective heirs, executors, administrators, successors, and assigns (as the case may be), until the surety company shall have executed a release under its corporate seal. The eighth paragraph makes the covenants and collateral security or indemnity, if any, available by and on behalf of the surety company for its benefit, "as well concerning any or all former or subsequent bonds or undertakings executed for us, * * * as concerning the bond or undertaking such covenants, collateral securities, or indemnity shall have been made, deposited, or given." The indemnity was signed by Blumauer, Mentzer, Hays, Campbell, and Copping as individuals, and by the bank by Blumauer, as president, and Hays, as cashier.

When the depository bond and indemnity agreement were delivered, the $25 premium was paid to the surety company. Marr's term as treasurer expired by law on January 8, 1913. Prior to June 22, 1912, when the first year of the bond, which had been given would have expired, the bank, acting through Hays, who was one of the indemnitors, paid the surety company $25 for a second year's premium on the bond, to continue the bond until June 22, 1913. But on January 8, 1913, a new treasurer, W. H. Britt, succeeded Marr. Before June 22, 1913, or the date of the expiration of the second year of the bond the bank, again acting through Hays, vice president, paid the surety company $25 premium for the purpose of extending the bond to June 22, 1914. Prior to June 22, 1914, the bank, again acting through Hays, paid to the surety company the premium of $25 "for the renewal of the depository bond," and advised the surety company that the county treasurer was Mr. Britt, who had succeeded Mr. Marr, and requested the surety company, if necessary, to make an indorsement to that effect, and, if necessary to issue a new bond, to do so and forward it. The surety company replied by inclosing a new bond duly executed in favor of W. H. Britt, county treasurer, effective June 22, 1914, and asking that the bank sign a new application, and that the treasurer send a release covering the former bond. Mr. Britt, as treasurer, delivered to the surety company a release, stating that as surety on the depository bond, dated June 22, 1911, in behalf of the bank, in favor of Robert Marr, treasurer of Thurston county, it was released from further liability thereon, "from and after the 22d day of June, 1914." A new application, signed by the bank, by Blumauer, president, and Hays, cashier, was also made for bond to issue from June 22, 1914, to June 22, 1915.

These additional circumstances are more or less relevant:

Mr. Marr as treasurer, opened his account with the bank on June 20, 1911, and closed it on January 8, 1913, on which day he retired as treasurer and took from the bank a certificate of deposit for $9,974.16. This certificate was never cashed, and on January 15, 1913, when Mr. Britt opened his official account, he deposited this identical certificate with the bank, and on September 17, 1914, he had a balance on deposit of $12,823.58. When the bank failed the treasurer demanded that the surety company should pay its lia-

bility on its bond, amounting to $4,327.87. The surety company demanded that the defendants pay this, but defendants refused, and thereafter, on December 30, 1914, the surety company paid to the treasurer of the county $4,327.87.

C. B. White, of Seattle, Wash., and John D. Fletcher and Robert E. Evans, both of Tacoma, Wash., for plaintiff in error.

Preston M. Troy and Robert F. Sturdevant, both of Olympia, Wash., and Charles O. Bates and Charles T. Peterson, both of Tacoma, Wash., for defendants in error.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge (after stating the facts as above). [1] The vital question in the case is whether the indemnity agreement was effective in September, 1914, when the bank failed. The answer can only be had by arriving at the actual intent of the parties, as it is to be deduced from every part of their agreement.

It is very clear that the purpose of the bank was to secure to itself the advantage of being made a depository of public funds which might come into the hands of the county treasurer. To carry out the purpose, the bank, through its president and cashier, applied to the surety company for a bond, which by the state was necessary to be given by a depository of public moneys. The obligee was to be the treasurer of the county. The surety company agreed to make the necessary bond, provided the defendants would personally indemnify it against loss of any money belonging to the county which would be deposited in the bank by the county treasurer. The defendants, except Mrs. Campbell, Mrs. Mentzer, and Mrs. Copping, made the indemnifying instrument, and the bank executed the bond, obligating the bank as principal and the surety company as surety unto Marr, individually and as county treasurer. The recitals in the bond refer distinctly to the deposit and custody of funds for which the treasurer would be responsible, and plainly it was executed with reference to moneys to come to the treasurer. The indemnifying agreement also on its face shows that the defendants had asked the surety company to execute a bond in favor of the treasurer of the county to cover the deposits of the treasurer. The indemnitors agreed, by the fifth section of their agreement, that the surety company might extend the bond and renew it, or make new obligation in its place or in lieu thereof, and withhold notice, and that their obligation would still remain "as fully as if such instrument were described at length herein," and would remain until the surety company should execute a release.

The payment of the first premium carried the bond to June 22, 1912, and the payment of the second premium was to carry out the purpose of the indemnitors to have the bond continue for another year or until June 22, 1913. In the meanwhile it happened that on January 8, 1913, a new treasurer came in. However, the bank remained the depository, and no new indemnity agreement was entered into by the indemnitors, and no new bond was executed by the bank; nor did the surety company execute a release to the indemnitors; nor does it appear that the in-

demnitors then made any claim that they had been released from the indemnity agreement. When another annual payment was forthcoming, and just prior to June 22, 1913, the bank again paid the surety company $25 annual premium for the purpose of extending the bond from June 22, 1913, until June 22, 1914. The correspondence between Hays, vice president of the bank, and Britt, the treasurer of the county, is ample evidence that the officers of the bank, who were also indemnitors in the agreement, paid this annual premium in order to continue the bond given by the surety company for the year to end June 22, 1914. All this was done without change in the status of the bank as a depository of public funds, and with the result that the bank and the indemnitors received the same character of benefits under the bond as continued from June 22, 1913, to June 22, 1914, that they had enjoyed under the previous indemnity agreements and bonds.

The bank and the surety company both understood that a new bond, dated June 22, 1914, was made to take the place of the one that had been issued to Mr. Britt's predecessor as treasurer. Mr. Britt, as treasurer, gave the bank, for the surety company, a release of the original bond, to be effective from and after June 22, 1914; but the indemnity agreement remained without suggestion that it ceased to be of effect. There was ample evidence to say that it was the intent that the bank should remain the depository, and that the indemnity agreement should continue; that the surety company's liability should continue without interruption, and that the last bond was not to change the several relationships or to interrupt them. This is confirmed by referring to the express agreement of the indemnitors that the surety company could extend the bond it had executed, or make a renewal thereof, or another or new obligation in its place and without notice, and in such case the indemnitors would still be liable. It is our opinion that under this agreement the indemnitors having received the benefit of the new or substituted bond after June 22, 1914, in the fact that the bank continued to be a depository, the release of the surety company on the original bond as effective of that date, did not terminate the indemnity agreement.

Again, it was immaterial to the indemnitors whether Marr or Britt was treasurer, for they did not undertake that the person who was treasurer would be faithful and honest; their agreement was that the bank (which was controlled, managed, and almost entirely owned by them) would pay the checks which the county treasurer might draw against any deposits which he made in the bank. The fact that the indemnitors continued to pay the premiums as they had agreed to do is proof of their desire that the bank should continue as a depository, and the indemnitors having agreed that the bond given by the surety company could be extended or that a new bond could be given in its place, and that the indemnitors would be bound until the surety company should release it, we believe that the several renewals and the bond given in lieu of the one for 1914, should be held as within their covenants. Hart v. Messenger, 46 N. Y. 256.

[2] The indemnitors make the point that the clause of their agreement wherein they bind themselves, their heirs and assigns, until the

surety company shall have executed a release under seal, is not enforceable, because contrary to public policy. We fail to see the applicability of such a doctrine to this case.

[3] The contention of the surety company that the liability is one of community, and that therefore the wives of the indemnitors were proper parties, is sustained by the decisions of the Supreme Court of Washington in Horton v. Donohoe Kelly Banking Co., 15 Wash. 399, 46 Pac. 409, 47 Pac. 435, and Way v. Lyric Theatre Co., 79 Wash. 275, 140 Pac. 320.

The court having erred in dismissing plaintiff's action, the judgment is reversed, and the cause remanded, with directions to grant a new trial.